UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| EVETTE ROBINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 19-cv-2156 |
| | ) |
| JANE MOSKUS, et al., | ) |
| | ) |
| Defendants. | ) |

## SUMMARY JUDGMENT ORDER

Plaintiff sued under 42 U.S.C. § 1983 and Illinois law, alleging Eighth Amendment claims for unnecessary and wanton infliction of pain and failure to protect, and state law claims, that occurred while she was incarcerated at Decatur Correctional Center. The matter is before the Court on Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder's Motion for Summary Judgment (Doc. 123). Plaintiff has filed a Response (Doc. 129) and Defendants a Reply (Doc. 133). Defendants' Motion for Extension of Time to File Reply (Doc. 132) and Motion for Leave to File Excess Pages (Doc. 134) are granted. The summary judgment motion is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in her

favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## FACTS

The Court determines the following facts are material to the resolution of this action.

### The Parties

Plaintiff was at all relevant times an inmate at Decatur Correctional Center.

Defendant Williams was a Correctional Officer and the Dietary Supervisor at Decatur. Defendant Jane Moskus was the Acting Warden at Decatur from May 2018 through August 2019. Defendant Robin Kirchhoff was promoted to Lieutenant of Internal Affairs at Decatur in August 2018. Defendant Brad Rogers was an External Investigator for IDOC's Investigations Unit beginning in December 2018. Defendant Shelith Hansbro was the Warden at Decatur from September 2010 through May 2018. Defendant Trina Snyder was the Lieutenant of Internal Affairs at Decatur from December 2015 through May 2018.

**Defendant Williams' Sexual Assaults of Plaintiff**

For purposes of this summary judgment order a reasonable jury could find that Defendant Williams sexually assaulted Plaintiff on March 22 and March 29, 2019. Williams pleaded guilty to state court charges of Custodial Sexual Misconduct and Official Misconduct based on assaults of Plaintiff. Williams has separate counsel from all other Defendants and has not moved for summary judgment.

**Plaintiff's Claims**

Plaintiff asserts an Eighth Amendment claim against Williams as well as several Illinois law claims. Plaintiff asserts Eighth Amendment failure to protect claims against the remaining Defendants, alleging they did less than the Constitution requires to protect Plaintiff from sexual assault by Defendant Williams. These Defendants have all moved for summary judgment.

**Policies and practices at Decatur**

Prison staff at Decatur conduct exit interviews of inmates who are soon to be released. Inmates soon to be released may be more forthcoming about various topics. About 98% of inmates receive an exit interview.

The Investigations Unit is outside the Warden's chain of command. UMF 85.[1]

Defendant Williams was not locked out or placed on administrative leave until after he had assaulted Plaintiff. Although the Warden does not have the power to

---

[1] "UMF" refers to Defendants' undisputed material facts that Plaintiff agrees are not in dispute. "AMF" refers to Plaintiff's additional material facts.

directly lock a person out of the facility, the Warden can request that such a lockout occur. Defendant Williams could not be locked out of the prison, placed on administrative leave, or disciplined for an unsubstantiated allegation. UMF 87-89.

### 2017 Investigations Against Defendant Williams

Defendant Snyder initiated a PREA investigation – Investigation #2017-DCT-5135 – following an exit interview of inmate Lamonica. UMF 91. Lamonica told Snyder that another inmate, McLane, said that inmate Fazio told her 1) she had sex with Defendant Williams in the back of the dietary unit, and 2) Defendant Williams showed her a naked picture of himself. UMF 92, 93.

Snyder asked inmate Fazio about these allegations and Fazio denied any inappropriate contact with Defendant Williams. UMF 94. Fazio said rumors started about her after she reported another inmate for stealing onions from the kitchen. UMF 95. Snyder also spoke to inmate McLane, who denied ever speaking to Fazio about a relationship with Defendant Williams. UMF 96. McLane also told Snyder that she never spoke to inmate Lamonica about inmate Fazio and Defendant Williams. Investigator William Parker – not a Defendant here – interviewed Defendant Williams. UMF 98. Defendant Williams denied that he engaged in sexual conduct with inmate Fazio. UMF 99. On November 7, 2017, inmate Lamonica's allegations against Defendant Williams were found to be unsubstantiated based on the lack of evidence. UMF 100.

On July 10, 2017, inmate Megan Seifrid told Correctional Officer Alexander James – not a Defendant here – that she "could have been with two officers already,"

and that "she may still have one" when she gets out. UMF 101. James submitted an incident report documenting Seifrid's statements. Seifird told Major Locke that Defendant Williams showed her a naked picture of himself in March or April 2017 and grabbed her buttocks while they were in an area of the prison known as the "hot box." UMF 103. Seifrid said she told inmates F. Johnson and J. Smith about the incident in the hot box. UMF 104. Major Locke initiated a PREA investigation following the interview of inmate Seifrid. UMF 105. Inmate J. Smith told Defendant Snyder that Seifrid did not tell her about flirting or anything along those lines regarding Defendant Williams. UMF 106. Inmate F. Johnson told Defendant Snyder that Seifird did not tell her about Defendant Williams showing her a picture of himself. UMF 107. Inmate F. Johnson told Defendant Snyder that Seifrid did not tell her that Defendant Williams touched her. UMF 108. Inmate F. Johnson told Defendant Snyder that Seifrid said that she was going to use Defendant Williams or other staff in the Dietary Unit to get back to Logan Correctional Center. UMF 109. Defendant Snyder had no role in the investigation beyond interviewing inmates F. Johnson and J. Smith.

On September 28, 2017, the investigation based on Seifrid's allegations against Defendant Williams was transferred to the Investigations Unit and assigned investigation number C17-DCT-473. UMF 111. Investigator Cheek – not a Defendant – was assigned to the investigation. UMF 112. Defendant Williams told Investigator Cheek that the hot box was the room where the furnace was located and where paper goods were kept. UMF 113. Defendant Williams denied that he went into the hot box

with Seifrid, that he touched Seifrid in an inappropriate way, or that he showed Seifirid a picture of himself. UMF 113.

Inmate Seifrid told Investigator Cheek that she went into the hot box with Defendant Williams one time. UMF 115. Seifrid told Cheek that Defendant Williams asked her to pull her pants down and that he grabbed her buttocks and touched her thighs. UMF 116. Seifrid told Cheek that she told inmates Johnson and Smith about the incident in the hot box, and that Defendant Williams showed her a picture of his erect penis. UMF 117, 118.

Inmate Smith told Cheek that Seifrid "was not someone she really trusted," and denied that Seifrid told her anything that Defendant Williams had done to her or showed her. UMF 119, 120.

Inmate Johnson told Investigator A.C. Kinard – not a Defendant – that she was not friends with Seifrid and that they did not discuss personal issues. UMF 121. Johnson denied that Seifrid told her about an incident involving Defendant Williams. UMF 122. Inmate Johnson told Investigator Kinard that Seifrid admitted to making the PREA complaint because it would help her get back to Logan Correctional Center. UMF 123.

On March 2, 2018, Seifrid's allegations against Defendant Williams were found to be unsubstantiated based on the lack of evidence. UMF 124.

On December 5, 2017, Defendant Snyder submitted a Facility Covert Operational Plan seeking approval to install a covert camera in the Dietary Unit. UMF 125. The purpose of the camera was to obtain incriminating video of Defendant Williams in

regard to custodial sexual misconduct and/or violations of PREA. UMF 126-127. The next day, December 6, Defendant Snyder's covert operational plan was approved by the Investigations Unit. UMF 128. On December 13, a covert camera was installed in the hot box. UMF 129. The camera was discovered by inmates a few days after it was installed, and the camera did not capture any useful footage. UMF 131, 132. No additional covert cameras were requested because Defendant Snyder believed that inmates would be on the lookout for them. UMF 133.

### 2018 Investigation Against Defendant Williams

Defendant Kirchhoff conducted an exit interview of inmate Sandra Beasley on November 16, 2018. UMF 134. Beasley told Kirchhoff that inmate Jamesa Williams said that Defendant Williams 1) sent her $300 in September or October 2018, and 2) she had kissed Defendant Williams. UMF 135, 136. Beasley told Kirchhoff that she was unsure whether what Jamesa Williams said was true because Jamesa Williams lies a lot. UMF 137. Kirchoff looked at inmate Jamesa Williams's trust fund account ledger in attempt to locate the deposit Beasley spoke of. UMF 138. Defendant Moskus and Defendant Kirchhoff discussed Beasley's allegations and agreed to send the investigation to the Investigations Unit due to the need to issue a subpoena. UMF 139, 141. It was assigned number C18-DCT-330. UMF 140.

Investigator William Parker – again, not a Defendant here – was assigned to the investigation. UMF 142. Defendant Kirchhoff was instructed by her supervisor at the Investigations Unit to assist the external investigator assigned to investigate Beasley's

allegations. UMF 143. The investigation was assigned to Rogers no later than December 20, 2018. AMF 167.

On December 27, 2018, a subpoena was issued to Western Union to obtain identity information regarding deposits into inmate Jamesa Williams' account. UMF 144. Investigator Parker advised Defendant Rogers that the investigation was on hold while he waited to receive a response to the subpoena. UMF 146. Defendant Rogers submitted a case status report on January 16, 2019, indicating that the status was "pending interviews and financial records," and on February 1, 2019, indicating the status was "pending interviews." AMF 169, 170. Western Union did not provide information that identified the identify of the person who deposited money into Jamesa Williams' account. UMF 147.

On March 20, 2019, Defendant Rogers interviewed Beasley. UMF 149. Rogers' first interview on the case was that day. AMF 171. Beasley provided more detail about Defendant Williams and inmate Jamesa Williams interactions in the Dietary Unit, including how Jamesa Williams wanted to get money from Defendant Williams, how Defendant Williams rubbed up against Jamesa Williams, that Jamesa Williams said she had kissed Defendant Williams several times, that Jamesa Williams and Defendant Williams talked in Defendant Williams' office for hours. Doc. 127-6 at 2-3.

Between December 20, 2018, and March 20, 2019, Rogers did not request copies of all prior investigations against Defendant Williams. AMF 172.

On March 28, 2019, Defendant Rogers interviewed inmates Sandy Noble, Dana Buntain, and Lynsie Olalade, who had all worked in the Dietary Unit. UMF 151.

Defendant investigator Rogers interviewed Noble on March 28, 2019, at about 12:00 – 1:00 p.m. Doc. 127-6 at 44. Noble said she had heard a lot of rumors about J. Williams and Defendant Williams, did not believe all the rumors because of "how J. Williams was," that J. Williams was bipolar and lied a lot, that J. Williams likes attention and caused a lot of problems in the kitchen, that J. Williams spent a lot of time in Defendant Williams office, that J. Williams never said she did anything sexually with Defendant Williams, that J. Williams implied to Noble that Defendant Williams sent money to inmates, that J. Williams was eventually fired from the kitchen and was mad at Defendant Williams for not saving her job, and that she (Noble) spoke with Defendant Williams about J. Williams' assertion that Defendant Williams did not want J. Williams "running her mouth," to which Defendant Williams replied that J. Williams could run her mouth all she wanted. Doc. 127-6 at 3.

Defendant investigator Rogers interviewed Buntain on March 28, 2019, from about 1:45 – 3:20 p.m. Doc. 127-6 at 46. Buntain told Rogers that she worked in the kitchen with Defendant Williams and J. Williams, that she kept to herself and did not see any sexual activity between Defendant Williams and J. Williams, that she had heard rumors that Defendant and J. Williams flirted a lot in the kitchen, that she saw Defendant Williams and J. Williams talking a lot (more than he talked to any other inmate), that she never saw anything but also that she thought that it was obvious that

something was going on between J. Williams and Defendant Williams, and that after J. Williams was fired from the kitchen, she came back and talked to Defendant Williams regarding rumors that J. Williams wanted to "take down" Defendant Williams. Buntain also said she had heard rumors that inmate Olalde and Defendant Williams flirted a lot with each other but that she had not seen anything. Doc. 127-6 at 3-4.

Defendant Investigator Rogers interviewed inmate Olalde on March 28, 2019, from about 4 to 6 p.m. Doc. 127-6 at 48. Inmate Olalde told Rogers that she worked in the kitchen at the same time as J. Williams and Defendant Williams, and heard rumors that Defendant Williams was involved in relationships with two inmates, one of whom was J. Williams. Olalde said she saw Defendant Williams and J. Williams talking a lot, and flirted a lot, and that J. Williams would get very jealous when Olalde talked with Defendant Williams. Olalde said that Defendant Williams grabbed her buttocks on at least two occasions over her clothes and asked her to go into a back room with him at least twice; when Olalde asked him why he wanted to "jump her bones." Williams once placed Olalde's hand on his erect penis over his clothes, stating "this is what you do to me." Olalde said when Defendant Williams asked her to go into a back room and when he grabbed her buttocks it made her feel very awkward. When he made her touch his penis he made her feel very uncomfortable and scared to say anything. Defendant Williams once offered to bring Olalde a Xanax pill because she was experiencing painful cramps. Defendant Williams encouraged Olalde to get a Facebook page upon her release and that he would add her as a friend, and that he had looked her up on

Facebook and she was "fucking gorgeous." Defendant Williams told Olalde that he would message her on KIK, and that he wanted her phone number. Defendant Williams said he had turned down a transfer offer to a facility closer to his house, and he implied that he would regret that decision if he got in trouble for messing around with inmates. Doc. 127-6 at 4-5.

Rogers interviewed Jamesa Williams on April 4, 2019. AMF 176. Jamesa Williams told Defendant Rogers that Defendant Williams had been giving her money and that they had sexual activity for a period of time. AMF 177.

Due to Plaintiff's allegations against Defendant Williams, first made on April 3, 2019, the allegations were referred to the Illinois State Police, and Moskus asked that Defendant Williams be locked out of the facility. UMF 155, 159. On April 4, Illinois State Police agents interviewed Plaintiff and Defendant Williams; at the conclusion of the interview with Defendant Williams, Defendant Williams was locked out of the facility and placed on administrative leave. UMF 162 – 164.

Overall, Rogers conducted thirty witness interviews in the course of this investigation. Aside from the interviews on March 20 and March 28, they occurred after the assaults of Plaintiff occurred. UMF 152, Doc. 129 at ¶152. Defendant Kirchhoff sat in on 21 of the 30 witness interviews. UMF 153. These additional interviews were conducted over the spring, summer, and fall months of 2019, after Defendant Williams had been locked out of the facility. Multiple instances of sexual abuse against multiple female inmates were ultimately substantiated. Doc. 127-6 at 24-26. Defendant Williams

was arrested by Macon County authorities in September 2019 for sexual abuse of inmates. *Id.*

On October 10, 2019, Beasley's allegations against Defendant Williams were found to be substantiated. UMF 154.

## ANALYSIS

**Legal standard.** "A prison official is liable for failing to protect an inmate from another prisoner only if the official 'knows of and disregards an excessive risk to inmate health or safety[.]'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To prevail on such a claim, a plaintiff must prove 1) the risk to the inmate is objectively serious, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and 2) the official has a state of mind that is deliberately indifferent to the inmate's health or safety. *Id.* "Deliberate indifference" means an official "knows of and disregards an excessive risk to an inmate's health or safety." *Farmer*, 511 U.S. at 837. To be culpable, the official must: (1) be aware of facts from which the inference can be drawn that a substantial risk of harm exists; and (2) must also draw the inference. *Id.* Deliberate indifference is more than simple ignorance; it requires a culpable state of mind, akin to criminal recklessness. *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006).

Actual knowledge by prison officials of the risk to the prisoner is critical. *See Farmer*, 511 U.S. at 844. More specifically, the question of what each individual IDOC Defendant knew is crucial:

> [S]howing mere negligence is not enough. Even objective recklessness—failing to act in the face of an unjustifiably high risk

> that is so obvious that it *should* be known—is insufficient to make out a claim. Instead, the Supreme Court has instructed us that a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm. Officials can avoid liability by proving they were unaware of an obvious risk to inmate health or safety.

*Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citations omitted). Rumors and speculation do not equate to actual knowledge. *See Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 827 (7th Cir. 2008) (noting that rumor and conjecture are not enough to create a factual dispute about a defendant's knowledge).

**Defendants aside from Williams are entitled to summary judgment.** The Court believes a reasonable jury could find that Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder were aware – in varying degrees not material to this Order – of the various allegations against, and investigations of, Defendant Williams. However, no reasonable jury could determine that any Defendant aside from Defendant Williams is legally responsible for Defendant Williams' abuse of Plaintiff.

Prior allegations against Defendant Williams had been raised on three occasions according to the record here. The 2017 allegations resulted in unsubstantiated findings due to lack of evidence. Notably, many of the allegations in those cases amounted to hearsay, or double hearsay, which investigators were unable to corroborate. The 2018 allegations did not assert Defendant Williams had engaged in sexual abuse. The fact that later it was determined that Defendant Williams had engaged in other sexual abuse of other inmates does not bear on the constitutionality of Defendants' actions based on what they knew at the time they took the relevant actions and inactions Plaintiff

complains of. Plaintiff did not report Defendant Williams' behavior until after the second assault occurred on March 29, 2019. Defendant Williams did not have sexual contact with Plaintiff after she reported his conduct, and indeed within a day of Plaintiff's allegations against Defendant Williams he was locked out of the facility.

For the following reasons Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder are entitled to summary judgment.

**Warden Defendants.** Wardens Moskus and Hansbro delegated investigatory duties to their subordinates. The status of the investigations at the time Plaintiff was assaulted by Defendant Williams did not put either on notice that inmates were at risk of serious harm at the hands of Defendant Williams.

The 2017 allegations of sexual misconduct were investigated and found to be unsubstantiated. And the Warden Defendants could not have inferred from the nature of the 2018 trust fund allegations that they were related to the 2017 misconduct allegations or that, even if related, the combined allegations created a substantial risk of physical harm to inmates at large, or to Plaintiff specifically.

Wardens Moskus and Hansbro did not conduct investigations, and Plaintiff is not constitutionally entitled to demand that they perform duties delegated to other officials. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[N]o prisoner is entitled to insist that one employee do another's job."). The record does not permit a reasonable inference that the Wardens' decisions to refer the allegations for an investigation was deliberately indifferent, that they intentionally shielded themselves from information

about Defendant Williams' alleged misconduct, or that they knew that their failure to take additional steps would subject any inmate to a substantial risk of serious harm. The Warden Defendants are entitled to summary judgment.

**Investigator Defendants.** The investigator Defendants – Defendants Kirchhoff, Rogers, and Snyder – are also entitled to summary judgment.

The 2017 allegations against Defendant Williams were unsubstantiated. Though those allegations involved sexual misconduct, after evaluating witness statements they could not be corroborated. The allegations alone are insufficient to put any Defendant on notice that Defendant Williams posed a risk of serious harm to other inmates. And there is no general constitutional right to an investigation of past wrongs. *Whitlock v. Brueggemann*, 682 F.3d 567, 588-89 (7th Cir. 2012); *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002).

As to the 2018 investigation, that investigation did not initially involve sexual abuse of a nature to indicate Defendant Williams was a serious threat to other inmates. Based on the information that they knew, no reasonable juror could find that the investigator Defendants knew of and disregarded a substantial risk of serious harm to Plaintiff. They carried out their job functions as investigators and did in fact ultimately determine that Defendant Williams had engaged in serious sexual misconduct. The fact that the investigations did not proceed quickly enough for other allegations to be corroborated prior to Defendant Williams assaulting Plaintiff does not amount to legal liability for the investigators.

The fact that Defendant Williams ultimately pled guilty to sexual misconduct based on his assaults of Plaintiff is immaterial to whether Defendants showed deliberate indifference. "The question is whether the situation posed a substantial risk of serious harm, measured on the front end. The Eighth Amendment does not rest on 20/20 hindsight." *Willis v. Pfister*, No. 18-CV-333, 2024 WL 216672, at *13 (N.D. Ill. Jan. 19, 2024)(citing *Wilson v. Cook Cnty.*, 742 F.3d 775, 782 (7th Cir. 2014) (explaining that deliberate indifference cannot rely on "20/20 hindsight"); *O'Brien v. Indiana Dep't of Correction ex rel. Turner*, 495 F.3d 505, 509 (7th Cir. 2007)).

These Defendants are entitled to summary judgment.

Although the Court addresses this matter on the merits, for the sake of completeness the Court finds analysis of the qualified immunity issue is appropriate as well.

**Qualified immunity.** Defendants argue they are entitled to qualified immunity. Qualified immunity protects government officials for reasonable mistakes that occur while carrying out their public duties. *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013). "The defense provides 'ample room for mistaken judgments' and protects all but the 'plainly incompetent and those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986).

To defeat a claim for qualified immunity the plaintiff must show that: (1) the defendant violated the plaintiff's constitutional right; and (2) the constitutional right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201

(2001). "A plaintiff may discharge the burden of showing that the constitutional right was clearly established by showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008), quoting *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001).

The courts are "'not to define clearly established law at a high level of generality'; [rather] [t]he dispositive question is 'whether the violative nature of the particular conduct is clearly established [and the] inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015).

Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder are entitled to qualified immunity here.

The right to protection from serious harm in prison, including sexual abuse, is clearly established. But that is not the full question here. The issue is whether Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder's actions in *addressing allegations of abuse* were a clearly established violation of law vis a vis the safety of other inmates. Assuming these Defendants had full knowledge of all past allegations and investigations, there is no clear precedent showing their response was unreasonable. *Doe v. Macleod*, No. 18-3191, 2023 WL 2698672, at *17 (C.D. Ill. Mar. 29, 2023)(no

controlling precedent holds the defendants' actions in investigating sexual abuse by guard could be constitutional violation).

The Court must still consider whether Defendants actions were "so egregious and unreasonable" that "no reasonable person could believe" those actions did not violate Plaintiff's clearly established constitutional rights. In *Macleod*, the court found that disputes of material fact precluded a finding of qualified immunity because the investigators never interviewed or questioned the defendant, and discontinued their investigation efforts. There, the court found "this is the rare case in which a jury could find" that the defendants' failure to take additional measures was so egregious and unreasonable that the plaintiff's Eighth Amendment rights were violated. *Id.*

The facts here are not so nuanced as in *Macleod*. The 2017 allegations had been found to be unsubstantiated, while the 2018 case remained open. Defendant Williams had been interviewed and questioned about all allegations, which he denied. Investigators asked the alleged victims of Defendant Williams' other acts about whether anything occurred, and were told that nothing had occurred, and variously that lies and rumors were being spread about them. At the time Defendant Williams assaulted Plaintiff, the open 2018 allegations were based on Defendant Williams depositing money in Jamesa Williams' trust account, and kissing Jamesa Williams, but not of having sex with Jamesa Williams. There were no past substantiated instances of sexual assault against Defendant Williams, and there were no unresolved allegations of sexual abuse of Plaintiff by Defendant Williams.

The Warden Defendants, Moskus and Hansbro, delegated investigation to employees who specialized in that role. The Investigator Defendants, Kirchhoff, Rogers, and Snyder, interviewed witnesses, subpoenaed records, and attempted to set up covert surveillance (though without success). Defendants' actions were not of an unreasonable and egregious nature such that no reasonable person could have believed those actions were lawful.

The Court finds Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder are entitled to qualified immunity in addition to being entitled to summary judgment on the merits.

**IT IS THEREFORE ORDERED:**

1) Defendants' Motion for Extension of Time [132] is GRANTED. Defendants' Motion for Leave to File Excess Pages [134] is GRANTED. Defendants' Motion for Summary Judgment [123] is GRANTED. Defendants Hansbro, Kirchhoff, Moskus, Rogers, and Snyder are terminated. Plaintiff's Second Amended Complaint [99] removed as a Defendant former IDOC Director Rob Jeffreys. The Clerk is to terminate Jeffreys as a Defendant.

2) The Final Pretrial Conference set for 4/23/24 is CONVERTED to a telephone status conference to reset the Final Pretrial Conference to allow the remaining parties to complete pretrial briefing as ordered herein. Only counsel for Plaintiff and the remaining Defendant, Williams, need appear. Call 551-285-1373 then enter Meeting ID 160 571 96032.

3) Jury trial remains set for 5/28/24 at 9:00 a.m. in Peoria. This date has been on the docket since January 8, 2024. Defendant Williams did not pursue summary judgment and there is no indication that he or Plaintiff will be unable to stick to the scheduled date.

4) Pretrial motions due 5/2/24. Responses and a joint proposed final pretrial order prepared in accordance with local rules, including all attachments, due 5/16/24.

Entered this 19th day of April, 2024.

*s/Michael M. Mihm*
MICHAEL M. MIHM
UNITED STATES DISTRICT JUDGE